**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **THOMAS E. SANTONI,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:20-cv-00975** |
| | ) | |
| **SARAH ELIZABETH MUELLER,** | ) | **JURY TRIAL DEMANDED** |
| **AND DOES #1-3, INCLUSIVE** | ) | |
| | ) | |
| | ) | |
| | ) | **Judge Eli Richardson** |
| **Defendants.** | ) | **Magistrate Jeffery S. Frensley** |

---

**PLAINTIFF'S FIRST AMENDED VERIFIED COMPLAINT**

---

Plaintiff Thomas E. Santoni (hereinafter "Mr. Santoni" or "Plaintiff"), by and through his undersigned counsel, for his First Amended Verified Complaint against Defendants states as follows:

**PARTIES**

1.    Plaintiff is an individual person and citizen of the State of Florida.[1]

2.    Upon information and belief, Defendant Sarah Elizabeth Mueller (hereinafter "Defendant SE") is an individual person and is presently a citizen and resident of the State of Arizona; however, she was a resident of Tennessee during the period when significant conduct constituting the claims for relief occurred.

3.    Upon information and belief, Does #1-3 are persons that assisted, acted in concert with, and/or conspired with Defendant SE to the detriment of Plaintiff as discussed below.

---

[1] Plaintiff was a resident of Williamson County, Tennessee at the time of the original filing of this action on November 11, 2020. However, Plaintiff has recently relocated to Florida.

1

4.     Plaintiff will seek leave of court to amend this First Amended Verified Complaint and insert the true names of Does #1-3 in place of the foregoing when the same become known to Plaintiff.

5.     Defendant SE and Does # 1-3 are sometimes hereinafter collectively referred to as "Defendants".

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, Plaintiff and Defendant SE are citizens of different states, and the amount in controversy exceeds $75,000.00, exclusive of interests and costs. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367, because this action involves claims for violations of the Stored Communications Act, 18 U.S.C. § 2701, and the Federal Wire Tap Act, 18 U.S.C. § 2510, as well as certain state law claims arising from the same.

7.     This Court has specific personal jurisdiction over Defendant SE based upon her tortious conduct in, and minimum contacts with the State of Tennessee. Defendant SE's tortious conduct was directed into the State of Tennessee, and as a direct and proximate result, Plaintiff has suffered damages in the State of Tennessee. Defendant SE also acknowledged specifically directing her conduct regarding Plaintiff into the State of Tennessee.

8.     Accordingly, this Court may therefore exercise personal jurisdiction over Defendant SE pursuant to Tennessee's Long Arm Statute as codified in Tenn. Code. Ann § 20-2-223 (a)(4).

9.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims, including without limitation, the injuries caused by Defendants' tortious conduct, occurred in this judicial district.

## FACTS

**A.**    **Factual Allegations Related to Defendant SE's Conduct Prior to Plaintiff's Filing of his Original Verified Complaint.**

10.    Plaintiff Thomas E. Santoni is a well-respected business executive and former Chief Executive Officer ("CEO") of, and investor in, The State Group Industrial (USA) Limited, (hereinafter, the "Company").

11.    Upon information and belief, Defendant SE is a political operative and former social media contractor who operates, controls, coordinates, and/or conspires with other individuals who run a network of dozens, if not hundreds, of politically motivated, automated, and semi-automated, Twitter accounts, also known as "bots" and collectively as a "bot farm"[2].  (The automated and semi-automated Twitter accounts are sometimes collectively referred hereinafter as the "Twitter Bot Accounts.")

12.    Upon information and belief, Defendant SE uses the Twitter Bot Accounts for various schemes such as sowing political discord, manufacturing outrage, cyber-bullying, and defrauding other social media users, including but not limited to Plaintiff.[3]

13.    Defendant SE also operates, controls, coordinates, dozens, if not hundreds of other, non-automated, Twitter accounts created under false identities, which she also uses for nefarious purposes such as trolling, cyber-bullying, "catfishing", and "block and report attacks" (Defendant SE's non-

---

[2]  *See* Renee DiResta et al, *The Bots That Are Changing Politics, A Taxonomy of Politibots, A Swelling Force in Global Elections That Cannot Be Ignored*, Vice (November 2, 2017), https://www.vice.com/en/article/mb37k4/twitter-facebook-google-bots-misinformation-changing-politics; *See also* Paul Blumenthal, *How a Twitter Fight Over Bernie Sanders Revealed a Network of Fake Twitter Accounts*, Huffington Post (March 14, 2018) https://www.huffpost.com/entry/democraticbotnetworksallyalbright_n_5aa2f548e4b07047bec68023;

[3]  *See* Chris Baraniuk, *How Twitter Bots Help Fuel Political Feuds, Scientific American* (March 27, 2018), https://www.scientificamerican.com/article/how-twitter-bots-help-fuel-political-feuds/;

3

automated fake Twitter accounts are sometimes referred to collectively, hereinafter as "Sock Puppet Twitter Accounts".)[4]

14.     In many circumstances, Defendant SE pretended to be several different people in the same Twitter conversation to manipulate the discourse, in which she often surreptitiously supported or attacked her own positions, depending on her agenda. She also used them to spam or launch coordinated verbal attacks on other Twitter users to "stir the pot" or maliciously get other Twitter users' accounts suspended.

15.     Defendant SE used the Bot Accounts and the Sock Puppet Accounts, in coordination, to promote, legitimize, or garner attention for her main personal Twitter account, @Sarahelizab370 (sometimes referred to hereafter as Defendant SE's "Personal Twitter Account") and/or her other Sock Puppet Accounts and/or those of her co-conspirators.

16.     Upon information and belief, examples of Bot and Sock Puppet Twitter accounts in Defendant SE's network and/or under her control include but are not limited to the following Twitter usernames:  @Miralaguna8;  @Butterfly4849;  @Janmueller;  @JamileeD;  @LifeofSarah370; @Snarkeduplawyer;  @Ann_crossley;  @Trulysarahwest;  @Jessydances;  @SarahExtra3770; @DeeBake79198450;  @LoveLaughVote;  @Mamabird7;  @Christophsouza;  @B1ancaros3; @Girlzinger;  @Slwein;  @Libf9wt;  @Jennaseeks;  @CMAlfJr;  @Adelsarnoff; @MichaelARMuell1;  @WolfWolfBlue2;  @Amziqureshi;  @AZLizzie;  @nickluca12; @Elizabe54602955;   @Elizabe71678983;   @Elizabe61852611;   @GB_number1fan; @Sarah51580278; @Elizabe99233837; @Elizabe78206403; @irisstainedglas; @akaJimmyBoy; @Elizabe77112684;  @Elizabe60950712;  @AZ_Brittney;  @Elizabe71678983;  @a_kribbs;

---

[4] *See* Jeanna Mathews, *How Fake Accounts Constantly Manipulate What You See on Social Media- And What You Can Do About It,* The Conversation (June 24, 2020), https://theconversation.com/how-fake-accounts-constantly-manipulate-what-you-see-on-social-media-and-what-you-can-do-about-it-139610.

4

@Elizabe9133425; @Sarah86523533; @CarrieCinNC; @LolaRose813; @lynx_socal; @ElizabethAlver6; @Elizabe55310491; @memelc; @nancyoneil1020; @vertebratesrock; @Sarah73770415; @lizinpdx; @CatScouse; and @SaraSid36074769.

17.     Defendant SE also used the Bot Accounts and Sock Puppet Accounts, in coordination with her Personal Twitter Account to trick or "catfish" other social media users whom she has never actually met, in hopes of having online relationships with them or to otherwise just mentally torment them.

18.     On November 30, 2018, Defendant SE direct Twitter messaged Plaintiff, in pertinent part:

> "*I don't want you to leave Twitter…even if you are too busy to post every day.* ***I'm just going to make you 5 accounts from Arizona so Twitter thinks you live out West and you'll be around to give me a hard time. I'm joking but I would so you can Tweet freely. I read people are using Google numbers to get past the number verification with cell phones***…" (emphasis added).

Collective Exhibit 1, *Twitter Direct Messages from Defendant SE to Plaintiff* at 3-4.

19.     Defendant SE posted pictures of models that she lifted from the internet as her profile pictures, commandeering, without permission, the images, and likenesses, of at least 5 different young women in the process. *See* Exhibit 2, *Mueller Sanctions Dep. Vol. I at* 78:13-84:3; Exhibit 3, *Mueller Sanctions Dep. Vol. II* at 172:21-173:1.

20.     Defendant SE has a documented history of impersonating other people through fake social media accounts and using those fake social media accounts to concoct false allegations against those who oppose her political views, the political view she promotes on behalf of others, and/or those who uncover her impersonation scheme. Exhibit 4, *Declaration of Nicole J. Monsees, Esq*.

21.     Upon information and belief Defendant SE also operated and/or currently operates fake accounts and impersonates other people on other social media platforms such as LinkedIn, Facebook, and Parler.

22.      Plaintiff is an accomplished businessman and corporate executive, who as a hobby and creative outlet used various social media platforms to discuss topics ranging from politics to religion and world history and who was unlucky enough to become ensnared in Defendant SE's web of deception and mental torment.

23.      According to Defendant SE, Plaintiff was well versed in history, politics, travel, food, cooking, and music, and that's why people followed him on Twitter. Exhibit 3, *Mueller Sanctions Dep. Vol. II at* 163:13-18.

24.      At all times relevant to this case, Plaintiff operated his social media accounts under pseudonyms to maintain his privacy. It is important to note there is a stark difference between legitimate and protected anonymous free speech using pseudonyms and posing as one or an entire network of third persons, for illegal or otherwise nefarious purposes.

25.      Defendant SE, by her own admission, would engage Plaintiff on social media even when she was not following him with her Personal Twitter Account (her known pseudonymous identity) just to be argumentative. According to Defendant SE's own words, this was because she made Plaintiff into someone not to like because she thought Plaintiff was pompous, and she was going through a difficult time. Collective Exhibit 1, *Twitter Direct Messages from Defendant SE to Plaintiff* at 12-13.

26.      Despite the pseudonymous nature of his online persona, Plaintiff's Twitter accounts appeared as though he had developed a small following over time. However, Plaintiff has come to learn that it might just have been Defendant SE swarming him with Bot and Sock Puppet Twitter accounts.

27.      Plaintiff was often engaged in debate, repartee, and banter with real, verified, professional journalists, political pundits, celebrities, and other full-time intellectuals and creatives such as comedians and media writers, who operated under verified Twitter accounts, signified by a blue

check mark next to their username, and other Twitter users in their own names, as well as others who also wished to remain anonymous.

28.     However, unbeknownst to Plaintiff at the time, aside from the verified accounts signified by a blue checkmark, based on information and belief, much of this was likely Defendant SE swarming Plaintiff's Twitter accounts with and/or coordinating with a network of Bot and Sock Puppet Twitter Accounts to deceive Plaintiff into believing he was communicating with many different people.

29.     Plaintiff and Defendant SE never met in person or even spoke on the phone. Their entire relationship was over social media. Almost all of Plaintiff's interaction with Defendant SE occurred over Twitter. *See* Exhibit 3, *Mueller Sanctions Dep. Vol. II* at 138:3-24; 175:1-18; 203:6-22; 209:8-210:7.

30.     Defendant SE interacted with Plaintiff through her Personal Twitter Account from 2016 until the late Spring of 2019. However, Defendant SE was also simultaneously communicating with Plaintiff on Twitter, pretending to be many different people, at the same time, in those same Twitter conversations. Plaintiff was unaware that he was the target of a coordinated psychological operation by Defendant SE and her co-conspirators.

31.     Defendant SE began defrauding Plaintiff while she was living in Waynesborough, Tennessee, and continued her tortious scheme from Tempe, Arizona after moving there in the late spring of 2018.

32.     During this period, Plaintiff and Defendant SE (through her Personal Twitter Account) engaged in repartee, sometimes "tongue-in-cheek" in discussing and expressing opinions related to political ideology, philosophy, and current events, which sometimes were expressed in heated and strident terms to such an extent that Plaintiff felt compelled to block Defendant SE on Twitter at various points in 2018 and 2019, so that she could no longer interact with him.

33.     Plaintiff felt that Defendant SE was exhibiting disturbing signs that she had developed a most-unwarranted deep infatuation with him akin to a delusional limerence[5]. Collective Exhibit 1, *Twitter Direct Messages from Defendant SE to Plaintiff* at 12-14; 22; 26; 57; 60; 65-66; 70; 81; 91; 96; 100; 143-144; 147.

34.     By way of example, on December 27, 2018, Defendant SE direct messaged Plaintiff on Twitter in pertinent part:

> I don't think anything of it because people are behind a screen. *I hope you reach out and touch me whenever your (sic) need to. To be raw and honest, I have thought about how my destiny would have been different if I had met you when I lived in California.* **I think I would have changed my mind about wanting to have a baby.** I'm grateful for your words and opinions. I think you are real, and good, and strong. I hope you always find me in the music you love**.** *I care about you as a man and you are in my heart.* (emphasis added).

Collective Exhibit 1, *Twitter Direct Messages from Defendant SE to Plaintiff* at 22.

35.     Defendant SE's messages to Plaintiff were designed to flatter Plaintiff and to stroke his ego. Exhibit 3, *Mueller Sanctions Dep. Vol. II,* 178:17-25; 203:6-22; 174:22-175:9.

36.     In fact, according to Defendant SE, from March 2019 forward, Defendant SE was generally at a place where she was stroking Plaintiff's ego. *Id*. at 182:3-10.

37.     Defendant SE also noted, "*It doesn't harm the man to think, oh, there's a girl out there that's got a little crush on you. Doesn't mean I'm going to go meet him.*" Exhibit 3, *Mueller Sanctions Dep. Vol. II* at 179:9-12.

38.     Defendant SE went on to testify under oath in her October 15, 2021, deposition on sanctions for spoliation of electronic evidence:

> Q.     So you were telling him you were going to go meet him.
> A.     No.  I never had any intentions of meeting him.

---

[5] "The state of being infatuated or obsessed with another person, typically experienced involuntarily and characterized by a strong desire for reciprocation of one's feelings but not primarily for a sexual relationship." https://www.lexico.com/en/definition/limerence (last visited 11/8/21).

Q.  You did.

A.  ***You can't look at this from a female perspective. I don't know what to tell you. Sometimes it's easier just to keep the peace and, hey, Sarah's got a little crush on me, you know, flatter him, stroke his ego, he will walk a little taller. Doesn't mean I'm rushing out to meet him.***

(emphasis added.)

*Id.* at 179:13-24.

39.    However, Defendant SE was indeed telling Plaintiff that she wanted to meet him, which Plaintiff found to be disconcerting given Defendant SE's increasingly obsequious and obsessive messages. This was one of the contributing events that led Plaintiff to block Defendant SE on Twitter.

40.    For example, on March 18, 2019, Defendant SE direct messaged Plaintiff on Twitter stating:

> You are going to start coming out west for work. I'm going to get myself in trouble for saying this. I am scared to meet you because I care about you and it's going to be hard on me if I finally meet you and I can't reach out for you. You always blindside me and I don't know how to react but I want to get myself in a place mentally to meet you if you are going to be coming out west. You are different than other men I've encountered…truly different.

Collective Exhibit 1, *Twitter Direct Messages from Defendant SE to Plaintiff* at 86.

41.    Defendant SE also appeared to have developed a hostile obsession with Plaintiff's wife and stepson. Defendant SE sent Plaintiff at least 24 separate Twitter direct messages in the span of 48 hours, calling Plaintiff's wife a "gold digger" or otherwise disparaging Plaintiff's wife and stepson.

Collective Exhibit 1, *Twitter Direct Messages from Defendant SE to Plaintiff* at 95; 97; 102-104; 107-112; 116-121; 123-128; 130; 132-133; 137.

42.    When Plaintiff blocked Defendant SE on Twitter in April 2019, Defendant SE reached out to Plaintiff through one of her Sock Puppet Twitter Accounts, posing as her "friend", "Myra", to make her case as to why Plaintiff should reengage with her on Twitter and unblock her. However, unbeknownst to Plaintiff at the time, Myra was just Defendant SE masquerading under the Twitter username, @Miralaguna8 (sometimes referred to herein as "Myra").

9

43. Defendant SE catfished Plaintiff, pretending to be Myra for at least six months. Myra also had a disturbingly elaborate backstory that could script a soap opera, involving a wealthy but much older significant other, an unlikely world-wind romance, a dramatic life changing weight loss, and a seven-year-old daughter who she liked to compare to Plaintiff's then twenty-seven-year-old stepson. On several occasions Defendant SE berated Plaintiff for offending or allegedly lying to her imaginary friend, Myra. Collective Exhibit 1, *Twitter Direct Messages from Defendant SE to Plaintiff* at 28-129;133-134; Collective Exhibit 5 at 1; Collective Exhibit 6; Collective Exhibit 7.

44. Plaintiff has come to learn that Defendant SE also used Myra to harass, defame, and defraud, a host of other Twitter users through various schemes.

45. Defendant SE also used Myra in coordinated "block and report attacks" where Defendant SE would coordinate additional Bot and Sock-Puppet Twitter Accounts and/or other Twitter Accounts controlled by co-conspirators, to simultaneously block and report another Twitter user for various purported and manufactured violations of the Twitter terms of service also known as the "Twitter Rules". This often resulted in the erroneous, automated, suspension of the targeted Twitter account, effectively silencing the opposing viewpoint of the Twitter user Defendant SE sought to eliminate.

46. Defendant SE testified in her October 15, 2021, deposition on sanctions for spoliation of electronic evidence:

> Q. And so I'd like -- let's go back for a second. You said that the Mira Laguna account was your political account.
> A. Right.
> Q. What exactly does that mean?
> A. It'll -- it'll be more explanatory when you get the PDF. *Jonathan, people were making -- you obviously -- I just -- I'm not trying to be condescending. You obviously don't understand how Twitter works and how the craziness that Trump brought to Twitter. People didn't want – people were just going around, trying to get everybody suspended and trying to attack each other and people didn't want it on their main accounts, so they used Twitter with different accounts.* (Emphasis added.)

10

Exhibit 3, *Mueller Sanctions Dep. Vol. II*, at 22:9-24.

47.     Defendant SE defrauded Plaintiff with Myra from at least March 2019 to August 2019.

48.     Defendant SE also used the nonexistent Myra to substantiate her false claims to the Company.

49.     Defendant SE was so committed to the scheme that she named Myra as a witness with "information related to the nature of Plaintiff's online conduct and his behavior toward Ms. Mueller and others" in her Rule 26 Initial Disclosures, in this litigation. ECF No. 39-5 at 4.

50.     Plaintiff has come to learn that before Defendant SE's Sock Puppet Twitter account was known as @MiraLaguna8, Defendant SE operated it under the Twitter handle @Butterfly4849 and under a different persona and then changed it to @MiraLaguna8. Exhibit 3, *Mueller Sanctions Dep. Vol. II*, at 40:18-41:9; 42:10-43:7.

51.     Defendant SE also catfished Plaintiff with the fictional @Butterfly4849.

52.     After Plaintiff was forced to block Defendant SE's main Personal Twitter Account because of her obsessive behavior, Myra, messaged Plaintiff on Twitter from at least April 23 to April 29, 2019, imploring Plaintiff to unblock Defendant SE on Twitter. Collective Exhibit 7.

53.     When that didn't work, and Plaintiff blocked Myra, Defendant SE created yet another Twitter account under the handle, @SarahExtra3770, to message Plaintiff on April 29, 2019.

54.     Defendant SE falsely told Plaintiff that Myra (not a real person) had to check on her because of Plaintiff's allegedly "abusive" treatment of her. Collective Exhibit 6.

55.     This was a false claim that Defendant SE repeated to the Company and its affiliates.

56.     Defendant SE later sent selectively edited screenshots of Plaintiff allegedly corresponding with her Sock Puppet Twitter Accounts, @SarahExtra3770, @Miralaguna8, and @Butterfly4849 to bolster her dubious and fraudulent claims to the Company and its affiliates[6]. *See* Exhibit 2, *Mueller Sanctions Dep. Vol. I*, at 67:11-68:9.

---

[6] Defendant SE has admitted to deleting her @SarahExtra3770 Twitter account after being served with process in this

11

57.     Then on May 19, 2019, Defendant SE sent an email to Plaintiff's pseudonymous blog email address, falsely accusing Plaintiff of publicly humiliating her by lying about her to Myra. In that email she calls Plaintiff a "great man" and laments the fact that Plaintiff would not reach out and make amends with her on Twitter. Collective Exhibit 5 at 1.

58.     Plaintiff did not respond to Defendant SE's email.

59.     On June 7, 2019, Defendant SE direct messaged Plaintiff on Twitter in pertinent part:

> *I don't believe in coincidences. Thanks for making me believe the "Great" ones still exist. You don't need to respond. Sometimes you come out of nowhere and do something that stops me in my tracks.* Maybe, one day I will understand. *I feel like you are a man who needs solitude to function with other things in life.* **I don't want to get on your nerves. I don't believe in chasing great men or caging great men. You just have to let them be what they are even if it hurts. I missed you.** *I don't want to fight with you or cause you stress.* Have a good weekend. Sarah (emphasis added.)

Collective Exhibit 1, *Twitter Direct Messages from Defendant SE to Plaintiff* at 152-153.

60.     Plaintiff did not respond to Defendant SE's message.

61.     The next day on or about June 8, 2019, Plaintiff lost access to his Twitter account. It was presumably suspended by Twitter at the hand of Defendant SE.

62.     Plaintiff made a new account on a different social media network, Parler, again under a pseudonym.

63.     Shortly thereafter, Defendant SE found Plaintiff on Parler, and implored Plaintiff to reengage with her, as was her custom. When Plaintiff refused, Defendant SE continued the pattern of harassment and tortious conduct that is the basis for this action.

---

litigation. According to Defendant SE, she did this because she feared that Plaintiff and/or his counsel would have her @SarahExtra3770 Twitter account suspended because it contained material related to Plaintiff's family. Exhibit 3, *Mueller Sanctions Dep. Vol. II*, 147:16-149:4; 151:12–147:16. Defendant SE's spoliation of the @SarahExtra3770 Twitter account has prevented Plaintiff from ascertaining the full extent of Defendant SE's tortious conduct because Twitter no longer has any of the data associated with the account. ECF No. 69-1, *Declaration of non-party Twitter Inc.*

64.    On June 10, 2019, Plaintiff's Parler Account suffered a password reset attack.  <u>Collective</u>

<u>Exhibit 8</u> at 6.

65.    At no point did Plaintiff provide Defendant SE with his name, the names of any of his business

associates, the Company and/or its affiliates, and/or any personally identifying information.

Defendant SE has also admitted this on multiple occasions. *See* <u>Exhibit 3</u>, *Mueller Sanctions Dep.*

*Vol. II* at 138:3-24; 175:1-18; 203:6-22; 209:8-210:7.

66.    For example, on March 23, 2019, Defendant SE direct messaged Plaintiff on Twitter in

pertinent part:

> "I've respected your privacy and never asked you to give me
> personal details about your work or who you are. However, that
> comes with me making a lot of mistakes or stabs in the dark with
> our friendship because I don't know a lot. ***I feel it's making me look***
> ***like an irrational, needy female when I'm not.*** That comes with
> giving me slack because I have always given you the power and
> upper hand. If that doesn't show trust, I don't know what will."
> (emphasis added.).

<u>Collective Exhibit 1</u>, *Twitter Direct Messages from Defendant SE to Plaintiff* at 93-94; *See also*

<u>Exhibit 3</u>, *Mueller Sanctions Dep. Vol. II* at 180:13-23.

67.    On August 7, 2019, Defendant SE sent another email to Plaintiff's pseudonymous blog email

address, to make more false allegations regarding Plaintiff's alleged treatment of her. In reality,

Plaintiff was the one who blocked Defendant SE on social media and refused to communicate with

her further due to Defendant SE's bizarre and obsessive behavior. Defendant SE goes on to say, in

pertinent part:

> Everything in life comes full circle for me. It ALWAYS does. God
> works in mysterious ways and I hope he is tying to protect me with
> this because it would not have happened with anyone else on
> Twitter…I have kept quiet about who you are and protected you. ***I***
> ***could have BLASTED you all over the Internet and you would***
> ***have never known it was me. PISS OFF for how you treated me.*** *I*
> *tried repeatedly and you made me out to be desperate or something.*
> I'm done being the cover for Internet assholes and people who hide.
> I don't ask anyone for anything and you berated me to the

floor…Don't worry. *I know we are not friends and I've felt that way since January.* I'm not desperate for friends much less a male friend who tears me down all the time and makes assumptions. It's not even fun for me. Best of luck with what you and your home are. I hope it makes you feel good but you are not good people. My kindness is not weakness but I'm tired. It's not my responsibility anyway. Enjoy Parler. (emphasis added.)

Collective Exhibit 5 at 2.

68.     Plaintiff did not respond to Defendant SE's email or otherwise communicate with her.

69.     However, six days later, on August 12, 2019, Plaintiff's Wife's Facebook account was hacked. Collective Exhibit 8 at 10.

70.     Upon information and belief, between October 2018 and August 2021, Defendant SE intentionally hacked into or attempted to hack into at least 7 different internet network accounts that were at one time owned or operated by Plaintiff and/or his family, including but not limited to Plaintiff's Gmail account, Plaintiff's Wife's Facebook Account, Plaintiff's Wife's Twitter account, Plaintiff's Wife's eBay account, Plaintiff's AT&T account, Plaintiff's Parler account, and Plaintiff's Twitter account. Collective Exhibit 8.

71.     Upon information and belief, as a direct and proximate result of the foregoing, Defendant SE harvested, downloaded, stole, and/or otherwise illegally obtained Plaintiff's confidential personal information (hereinafter "original illegally obtained personal information").

72.     Upon information and belief, Defendant SE used the original illegally obtained personal information to hack into and/or attempt to hack into various additional internet accounts owned or operated by Plaintiff and/or Plaintiff's immediate family with whom he lived.

73.     As a direct and proximate result of the foregoing, Defendant SE intentionally harvested, downloaded, stole, and/or otherwise illegally obtained Plaintiff's confidential personal information (hereinafter "subsequent illegally obtained personal information").

14

74.     Between March 2019 and July 2020, Defendant SE intentionally transmitted, caused to be transmitted, and/or attempted to transmit the original and subsequent illegally obtained personal information to various third parties for her own benefit as well as to maliciously harass, intimidate, interfere with Plaintiff's business relationships and contracts, inflict emotional distress upon, and/or otherwise harm Plaintiff and/or his reputation.

75.     Defendant SE sent Plaintiff pictures of Plaintiff and his wife obtained from the internet accounts at issue, as well as other nefarious electronic messages, to maliciously harass, intimidate, inflict emotional distress upon, and/or otherwise harm Plaintiff. She also sent Plaintiff pictures obtained from his stepson's private Facebook and Instagram pages.

76.     Defendant SE utilized the original illegally obtained personal information and/or subsequent illegally obtained personal information, in whole or in part, to ascertain various members of Plaintiff's family, friends, and those with whom Plaintiff did business, including without limitation, the Company and its affiliates.

77.     After becoming aware of Plaintiff's contractual and business relationships, Defendant SE subsequently set about intentionally and maliciously interfering with Plaintiff's contractual and business relationships with the Company and its affiliates by intentionally inducing the Company and/or its affiliates to illegally breach their contractual agreements with Plaintiff and to abruptly cease doing any and all business with Plaintiff. This includes but is not limited to the illegal seizure of certain equity securities owned by Plaintiff, by the Company and its affiliates.

78.     Defendant SE accomplished this, in whole and/or in part, by deliberately contacting the Company and its affiliates and intentionally making statements to them, about Plaintiff, that were false, misleading, inaccurate, and/or cast Plaintiff in a false light, without justification, in an effort to intentionally harm Plaintiff.

15

79.     Defendant SE also intentionally supplied the Company and its affiliates with data, documents, and/or information that was illegally obtained in whole or in part, and/or which was either false, forged, manufactured, misleading, and/or inaccurate, to cast Plaintiff in a false light, with the goal of inducing the Company and its affiliates to cease doing business with Plaintiff, breach their contractual agreements with Plaintiff, and/or otherwise harm Plaintiff and/or enrich herself.

80.     Succinctly, Defendant SE's conduct induced the Company and its affiliates to fire Plaintiff from his position as CEO of the Company.

81.     Upon information and belief, between December 11, 2019, and June 11, 2020, Defendant SE sent the Company and its affiliates at least 14 emails, that contained no less than 35 false, defamatory, and/or misleading statements, which placed Plaintiff in a false light before the Company and its affiliates. Collective Exhibit 10.

82.     Notably, and in a clear effort to inflict maximum damage to Plaintiff, Defendant SE initiated this tortious disinformation campaign by directly emailing the Company's private equity investors. Defendant SE did not have any prior connection or relationship to the Company, its private equity investors, and/or any of its affiliates.

83.     After August 2019, Plaintiff heard nothing further from Defendant SE until he was contacted by the Company, a little over five months later, in December 2019.

84.     As discussed below, as a direct and proximate result of Defendant's actions, Defendant SE was indeed successful in harming Plaintiff and making him suffer damages by inducing the Company and/or one or more of its affiliates to cease doing business with Plaintiff and terminating his employment.

85.     Although Plaintiff warned the Company and its affiliates that he was being stalked. The Company and its affiliates refused to provide Plaintiff with Defendant SE's allegations, the materials she allegedly provided to them, or an opportunity to refute the allegations.

16

86.     Defendant SE acted in concert and/or conspired with other persons to successfully, tortuously, interfere with Plaintiff's contracts and business relationships with the Company and its affiliates.

87.     Defendant SE did not stop her campaign of stalking, harassment, and cyber-bullying, after Plaintiff was terminated by the Company and its affiliates as counsel for the Company and its affiliates suggested she would do after Plaintiff was terminated as CEO of the Company.  Instead, Defendant SE was only emboldened. Enraged that Plaintiff still refused to contact her, Defendant SE peppered Plaintiff with bizarre and threatening emails and social media messages. *See* Collective Exhibit 5.

88.     Defendant SE bragged over social media, through her Personal Twitter Account as well as through her Sock-Puppet Twitter account, @Miralaguna8, that she had gotten Plaintiff fired and of her working relationship with counsel for the Company, Jonathan Sulds, who she identified by name.

89.     On March 12, 2020, Plaintiff and his wife received a notification that their eBay account had been hacked. Collective Exhibit 8 at 3.

90.     On March 23, 2020, approximately ten days after the Company and/or its affiliates took Plaintiff's equity units in the Company insistent to his termination, Defendant SE sent Plaintiff an email ostensibly bragging about getting him fired. In that email she also makes a host of rambling, false allegations against Plaintiff, explicitly stating:

> *After reaching out to Adam Blumenthal of Blue Wolf Capital, I spent two months communicating with the attorneys of Blue Wolf Capital and The State Group about how you acted towards me* and what your (sic) were communicating online…It must suck trying to convince yourself you are a man each day. Real men behave nothing like you…*Until God or my Mom tells me so, I am done with how people treat me*.  *So, don't spend one day of your life expecting me to keep quiet about how you treated me.*  Blue Wolf Capital was so freaked about your behavior, they had lawyers calling my house the next day.  *I know you were fired from The State Group because they told me so.  I was clear with their attorney I was only keeping it quiet out of respect to them and the employees of The State Group while they talked to me.  I owe abusive men nothing…Many prayers for*

17

your late brother Vince Santoni. *He Helped **us** verify who you were.*
I guess I have a guardian angel in someone else you treated horribly.
You think it's fun to be abusive to people. You think it's fun to try
and manipulate people to do somethings that will hurt them as long
as it benefits you. You think it's fun to make people feel threatened.
You are an abusive man. Become a man soon. I am not your secret
Keeper…(emphasis added.)

 Collective Exhibit 5 at 3.

91.     Then on March 30, 2020, Defendant SE, made up a new Parler username[7],
@LibertyBelleUSA, to find and message Plaintiff on Parler:

"What's wrong Tom Santoni? Not man enough to say all the
disgusting things you say to people without hiding behind fake
name? (sic) How many Twitter accounts are you up to now. It must
suck to know you are nothing but a fat fucking clown who lacks the
ability to be a man. Stick to being a financial bitch for the people
who only look the other way for the cash. You are a joke of a man.
LOL!!!

Collective Exhibit 5 at 5.

92.     Then on April 24, 2020, Defendant SE posted on her Personal Twitter Account falsely
suggesting in no uncertain terms that Plaintiff was advocating to shoot Democrats at a Coronavirus
protest at the Arizona State Capitol. Collective Exhibit 5 at 6.

93.     Defendant SE then liked the post with her sock puppet Twitter accounts @Miralaguna8 and
@Lovelaughvote.

94.     Then on May 11, 2020, at 11:24 A.M. Defendant SE sent Plaintiff an email stating:

Don't lie about me or why you were fired from The State Group. If
I find out you or any (sic) is lying about me, I will talk to more
lawyers. If I find out anyone has lied to me, I will talk to more
lawyers. Since you thought it was appropriate to attack me in private
messages with your abusive, irrational and false allegation
comparing me to your friends- *your friends now know how abusive
you are about them when you talk to other people…You are one
abusive clown. Grow up and become a man soon.* (Emphasis added.)

---

[7] Plaintiff has come to learn that Defendant SE posted on the social media network Parler under usernames including
but not limited to @Janmueller, @Coastalblue, @Bluesarah, @Bluudevil, and @LibertyBelleUSA.

Collective Exhibit 5 at 7.

95.     Then approximately 3 hours later on May 11, 2020, at 2:23 P.M., Defendant SE emailed

Plaintiff: "*Tom Santoni…just another pathetic lying Trump supporter. Tom Santoni…LIAR.*

*Become a man soon….Liar.*" (Emphasis added.) *Id*. at 8.

96.     Then approximately ten minutes later, on May 11, 2020, at 2:33 P.M., Defendant SE emailed

Plaintiff:

> Tom Santoni…just another lying Trump supporting clown. Tom
> Santoni the man who threatened to shoot me, degrade me, and say I
> deserved to be physically slapped. I saved it all. The State Group has
> no operations in Phoenix and you travelled to Canada only. Liar.
> You and your wife really should keep your charade in your home
> and away from Americans. Sarah.

*Id*. at 9.

97.     When Plaintiff would still not relent and contact Defendant SE, Defendant SE set her sights

back on Plaintiff's friends and family.

98.     Defendant SE contacted and communicated with Plaintiff's friends and family by publicly

posting to their social media profiles as well as through private messages to cast Plaintiff in a false

light for the purpose of harassment, intimidation, and intentional infliction of emotional distress, to

harm Plaintiff in his reputation and relationships. She obtained the information in which to

accomplish this, in whole or in part, by hacking or illegally breaching Plaintiff's Wife's Facebook

Account.

99.     Upon information and belief Defendant SE communicated and/or collaborated with the

Company and its affiliates throughout this period.

100.    After Plaintiff was terminated by the Company, Defendant SE also specifically deleted certain

Twitter communications that were highly relevant to this litigation to aid the Company and its

affiliates and herself and hinder Plaintiff's ability to defend himself from her defamatory and fraudulent allegations. *See* Exhibit 2, *Mueller Sanctions Dep. Vol.* at 126:6-127:3.

101.    On May 25, 2020, Defendant SE, appeared to tweet in reference to the Company and its affiliates "*some tough New Yorkers had my back over the last few months, I hope they are well. #Covid19.*" Collective Exhibit 5 at 10.

102.    Then later, in the early morning hours of May 26, 2020, Defendant SE, posing as Myra, under the Twitter username @Miralaguna8, threatened another Twitter user and bragged about getting Plaintiff fired when she Tweeted: "*Dear, I just spent months talking to top lawyers in NYC and a CEO was fired because of it. Let me know when you have the balls to use your real name.*" Exhibit 4, *Declaration of Nicole J. Monsees, Esq.*

103.    Then shortly thereafter, in that same conversation, under her Personal Twitter account, @SarahElizab370, Defendant SE posted, "*Actually I made the complaint against the CEO. The attorney I dealt with was Jonathan Sulds of Green (sic) Taurus. Got a problem with it.*" *Id.*

104.    Ironically, the other Twitter user whom Defendant SE was threatening, happened to be a licensed attorney, Nicole J. Monsees ("Attorney Monsees"). Exhibit 4, *Declaration of Nicole J. Monsees, Esq.*

105.    Attorney Monsees and a group of other Twitters users, including Defendant SE (under at least two different identities), were engaged in a debate regarding viral video footage that had recently been posted showing a white woman named, Amy Cooper, in central park, calling 911 and falsely reporting that a black man was threatening her, which had just occurred hours earlier on May 25, 2019. Also adding to the tension was the fact that George Floyd had been tragically killed that same day. *Id.*

106.    Attorney Monsees then realized that the Twitter user under the handle @Miralaguna8, who also appeared to be defending the actions of Amy Cooper, and who was debating with her regarding

whether or not Amy Cooper had a valid civil cause of action, was the same person who appeared to be participating in the conversation under the Twitter handle, @SarahElizab370. *Id.*

107.   After checking the two accounts, Attorney Monsees posted screen captures of Defendant SE's dubious claims. *Id.*

108.   As a result, Defendant SE falsely accused attorney Monsees of "stalking" her, because Attorney Monsees had read and reposted Defendant SE's public Tweets. Defendant SE then blocked Attorney Monsees on Twitter with both her @SarahElizab370 and @Miralaguna8 accounts and deleted her Tweets from the conversation. *Id.*

109.   Defendant SE testified under oath in her October 15, 2021, deposition on sanctions for spoliation of electronic evidence:

> *this conversation was deleted the night it happened.  I guarantee it because I didn't want that whole -- I didn't want that whole issue on Twitter because Adam Blumenthal and all those people are on Twitter, and these crazy people would have gone and tagged them and brought them into it.  And I didn't want that for myself and for them.*" (Emphasis added.)

Exhibit 3, *Mueller Sanctions Dep. Vol. II* at 126:6-127:3.

110.   Defendant SE also went on to note that she was "just very respectful of the fact" that Adam Blumenthal[8] is on Twitter and that she doesn't "want to bring all this craziness towards him." *Id*; *See also* Exhibit 2, *Mueller Sanctions Dep. Vol. I* at 50:7-16.

111.   When asked "what does it mean to be respectful?", Defendant SE testified:

> I don't want -- I don't want to bring my complaint to his Twitter account or Twitter to where they would have to make a statement about it.  I've been very -- I think I've been very respectful to the State Group and Blue Capital in this whole thing.  Because if people on Twitter were talking about this, they would tag Adam Blumenthal and the State Group and Bennet and they would drag all them into it.  It's how I know I haven't been doing it because I'm being respectful to Adam Blumenthal, you know.  He's the one

---

[8] Adam Blumenthal is the managing partner of Blue Wolf Capital Partners LLC, a private equity firm, with a controlling interest in the Company.

person who believed me when I was afraid of Tom Santoni, so take it to what you want.

Exhibit 3, *Mueller Sanctions Dep. Vol. II,* at 132:3-16.

112.  Defendant SE has also noted that was a "big deal to fire someone from a company" and if Plaintiff had not been "fired", she would have been "walking around keeping secrets" for the Company and its affiliates. *Id*. at 132:21-133:4.

113.  Defendant SE also stated that she wanted Plaintiff to "retire". Exhibit 3, *Mueller Sanctions Dep. Vol. II,* at 181:14-15; *See also* Exhibit 2, *Mueller Sanctions Dep. Vol. I at* 76:20-77:11.

114.  Then on June 10, 2020, almost four months to the day after Plaintiff was terminated by the Company, Defendant SE emailed Jonathan Sulds, counsel for the Company and its affiliates, to ostensibly brag about tracking down and reaching out to one of Plaintiff's childhood friends of fifty years, just to tell him about this episode and getting Plaintiff fired. Defendant SE even noted in that email that it, "probably wasn't necessary but here it is anyway." Collective Exhibit 9 at 1.

115.  In that email, Defendant SE went on to write,

> "*Please extend my gratitude to Adam Blumenthal, Bennet Grill, and Marc Dumont*. It's not forgotten that I was asking people to listen and believe what I was trying to communicate about Tom Santoni. *My concern about his behavior was real and you all gave me an exit to a situation I did not want to be in*. (Emphasis added.)

Collective Exhibit 9 at 1.

116.  Then the next day on June 11, 2020, Defendant SE again emailed Jonathan Sulds and stated in pertinent part, *"This is probably not necessary but be careful when it comes to Tom Santoni. Thank you all again for believing me. I wish everyone on the other end of this conversation the best with everything going on.*" (Emphasis added.) Collective Exhibit 9 at 2.

117.  Then on or about September 22, 2020, Defendant SE publicly posted the following to Plaintiff's stepson's Instagram account:

"I spent month (sic) this past year talking to corporate lawyers because of Tom Santoni. He is one abusive lying clown. If Tom thinks it's appropriate to go around lying about why he was fired with his childish "freedom of speech" and I was a victim of cancel culture against "conservatives," I have a lot to write about and say. *You can let Tom know that since The State Group and Blue Wolf Capital fired him because of his behavior towards me, that I consider his behavior towards me and others (including my 77 year old mother) predatory, abusive, threatening and way over the line. It's all saved. This clown needs to keep his threats in his own home.* But hey, if Tom does want to claim cancel culture I guess he can take responsibility for the racist and violent things he has been doing to people on social networks. I'm not the secret keeper for abusive men who think it's appropriate to degrade me and I don't lie to top corporate lawyers in NYC for Tom Santoni. Thanks for the photo of the man who like to degrade me by talking about my panties, saving I deserved to be physically slapped...and so MUCH more. Tom should probably stick to sending women Marillion music and invites to dinner on business trips in the future or some other ridiculous game he invents. I hope you (sic) parents grow up soon because I have a LOT to say if they are claiming cancel culture over Tom's firing from The State Group. Best to you" (Emphasis added.)

Collective Exhibit 5 at 11.

118. After Plaintiff's stepson deleted Defendant SE's post, Defendant SE, publicly, re-posted a revised version of it to Plaintiff's stepson's Instagram account three days later, on or about September 25, 2020:

I spent month *(sic)* this past year talking to corporate lawyers because of Tom Santoni. He is one abusive, lying clown. If Tom thinks it's appropriate to go around lying about why he was fired with his childish "freedom of speech" and I was a victim of cancel culture against "conservatives," I have a lot to write about and say. You can let Tom know that since The State Group and Blue Wolf Capital fired him because of his behavior towards me, that I consider his behavior towards me and others (including my 77 year old mother) predatory, abusive, threatening and way over the line. It's all saved. This clown needs to keep his threats in his own home. But hey, if Tom does want to claim cancel culture I guess he can take responsibility for the racist and violent things he has been doing to people on social networks. I'm not the secret keeper for abusive men who think it's appropriate to degrade me and I don't lie to top corporate lawyers in NYC for Tom Santoni. Thanks for the photo of the man who like (sic) to degrade me by talking about my panties,

23

saving I deserved to be physically slapped...and so MUCH more. Tom should probably stick to sending women Marillion music and invites to dinner on business trips in the future or some other ridiculous game he invents. *I hope you (sic) parents grow up soon* because I have a LOT to say if they are claiming cancel culture over Tom's firing from The State Group. *How psychotic are you when a company fires you from a CEO position AND erases all traces (press releases to website photos) of you being associated with the company to begin with?* (Emphasis added.)

Collective Exhibit 5 at 12.

119.    There is absolutely no conceivable legitimate reason for Defendant SE to be harassing Plaintiff's stepson.

120.    On September 26, 2020, Defendant SE Tweeted from her Personal Twitter account to Senator Marco Rubio's official campaign Twitter account: "*It you are selling a t-shirt that mocks a woman and SCJ that has not even been buried yet, you are Tom Santoni level of disgusting. I'm so over how pathetic and toxic my country has become. I hope hell exists…*". (Emphasis added.)  Collective Exhibit 5 at 13.

121.    Defendant SE then liked the post with her Sock Puppet Twitter account, @Miralaguna8.  *See Id.*

122.    On October 31, 2020, Defendant SE Tweeted from her Personal Twitter account, in reference to the then President of the United States, "*True Texans don't act like this. Trump is all talk and no cattle. It's Tom Santoni level of disgusting. Get out of Texas with this BS. So over it*."[9] (Emphasis added). Collective Exhibit 5 at 14.

---

[9] As more fully described in *Plaintiff's partially granted Motion for Sanctions, Discovery, and Other Relief for Spoliation of Electronic Evidence,* (ECF No. 38-39, 52-53), Defendant SE intentionally deleted this Tweet, the Tweets referend in Paragraphs as well as hundreds, if not thousands of other Tweets relevant to her tortious conduct toward Plaintiff and this litigation, shortly after being served with process in this original action on November 19, 2020.

24

123. Then later, on October 31, 2020, Defendant SE Tweeted from her Personal Twitter account to the then President of the United States, "*No true Texan would do this you Tom Santoni level piece of shit*." (Emphasis added.) Collective Exhibit 5 at 15.

124. On November 2, 2020, Defendant SE Tweeted from her personal Twitter Account, *Texan here. Trump is as sociopathic as Tom Santoni. Thankful Texas was a classier place when it raised me. Stop doing asshat things in the name of #Texas. It's weak."* (Emphasis added.) Collective Exhibit 5 at 16.

125. On November 2, 2020, Defendant SE Tweeted from her personal Twitter Account, "*Texan here. Trump is as pathetic as Tom Santoni. Thankful Texas was a classier place when it raised me. Stop doing asshat things in the name of #Texas. It's weak. Don't let this abusive behavior distract you…*" (Emphasis added.) Collective Exhibit 5 at 17.

126. Defendant SE's conduct left Plaintiff no option but to seek relief from this Court through the filing of this original action on November 11, 2020.

**B.    Factual Allegations Related to Defendant's Tortious Conduct Occurring After the filing of Plaintiff's original Verified Complaint.**

127. Plaintiff filed his original Verified Complaint in this matter on November 11, 2020.

128. Defendant SE was personally served with process on November 19, 2020, at approximately 8:52 a.m., pacific standard time.

129. Shortly thereafter, in the early morning hours of November 20, 2020, Defendant SE, published a series of false and defamatory statements regarding Plaintiff, referencing Plaintiff's allegations in the instant lawsuit, to her @SarahElizab370 Twitter account.

130. Upon information and belief, Defendant SE made the aforementioned defamatory statements at approximately 12:48 a.m., 1:07 a.m., 1:22 a.m., and 1:31 a.m., respectively, on November 20, 2020. A copy of the statements at issue are enumerated in Collective Exhibit 11, attached hereto.

25

131.    Upon information and belief, Defendant SE then deleted her @Miralaguna8 Twitter account, that she used to defraud and catfish Plaintiff, at approximately 1:39 a.m. on November 20, 2020.

132.    Defendant SE, using her @SarahElizab370 Twitter account, then made another series of false and defamatory statements regarding Plaintiff later that day on November 20, 2020, at approximately 12:13 p.m. and 10:59 p.m., respectively. A copy of the statements at issue are enumerated in Collective Exhibit 11, attached hereto.

133.    Defendant SE, using her @SarahElizab370 Twitter account, published another series of false and defamatory statements regarding Plaintiff on November 24, 2020. A copy of the statements at issue are enumerated in Collective Exhibit 11, attached hereto.

134.    On December 1, 2020, Defendant SE deleted her @SarahExtra3770 Twitter account, that she used to harass Plaintiff and defraud him regarding her @Miralaguna8 account, which she used to impersonate her non-existent friend, Myra.

135.    On February 23, 2021, Defendant SE named her @Miralaguna8 account ("Myra") as a witness with discoverable "information related to the nature of Plaintiff's online conduct and his behavior toward Ms. Mueller and others" in her Rule 26 initial disclosures. ECF No. 39-5 at p.4.

136.    Upon information and belief, on or about June 13, 2021, Defendant SE attempted a password reset attack on Plaintiff's wife's AT&T account.

137.    Defendant SE, using her @SarahElizab370 Twitter account, made a further series of false and defamatory statements regarding Plaintiff on June 17, 2021, June 18, 2021, June 19, 2021, and September 4, 2021, respectively. A copy of the statements at issue are enumerated in Collective Exhibit 11, attached hereto.

138.    On September 30, 2021, Defendant SE sat for a remote video deposition regarding her spoliation of electronic evidence in this litigation, pursuant to this Court's September 3, 2021, Order. During that deposition Defendant SE was questioned, among other things, about her

26

@SarahElizab370 and @LifeofSarah370 Twitter accounts. The deposition was adjourned early to accommodate the schedule of defense counsel and at their request.

139.    Within hours of pre-maturely adjourning the remote video deposition, Defendant SE intentionally blocked Plaintiff's counsel on Twitter and set her accounts to private, in violation of the Court's September 3, 2021, Order. Defendant SE also refused to cooperate with Plaintiff's counsel regarding the digital forensic imaging of her electronic devices as ordered by the Court in its September 3, 2021, Order.

140.    Upon information and belief, Defendant SE deleted large amounts of additional electronic evidence related to these accounts as well as her Bot and Sock Puppet accounts to prevent Plaintiff from discovering and using the information in this litigation.

141.    Undeterred, Defendant SE, using her @Sarahelizab370 and @LifeofSarah370 Twitter account made a series of outrageously false and defamatory statements regarding Plaintiff on February 2, 2022, February 15, 2022, February 16, 2022, February 17, 2022, February 18, 2022, February 25, 2022, February 26, 2022, March 11, 2022, April 23, 2022, April 26, 2022, April 27, 2022, April 28, 2022, April 29, 2022, May 7, 2022, May 8, 2022, May 9, 2022, May 11, 2022, May 24, 2022, May 28, 2022, May 29, 2022, June 2, 2022, June 3, 2022, and June 4, 2022. A copy of the statements at issue are enumerated in Collective Exhibit 11, attached hereto.

142.    By way of example, among other egregious things, in multiple instances, Defendant SE accused Plaintiff of abusing her, stalking her, physically dragging her, and breaking and/or otherwise being directly responsible for her broken foot. This is of course absurd, because as mentioned above, Plaintiff and Defendant SE have never met in person.

143.    Plaintiff reserves the right to further amend this First Amended Verified Complaint as additional facts become known through the discovery process.

27

# CAUSES OF ACTION

## COUNT I
## COMMON LAW AND STATUTORY TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Defendant SE)

144.    Plaintiff incorporates and restates each of the above paragraphs as if fully stated herein.

145.    Tenn. Code. Ann. § 47-50-109 provides:

> It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages.

Tenn. Code. Ann. § 47-50-109.

146.    Defendant SE knew of Plaintiff's contractual and business relationships with the Company and its affiliates. Defendant SE intentionally interfered with and induced the termination of these existing relationships by publishing false, misleading, and/or defamatory statements. *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002).

147.    Defendant SE intentionally, maliciously, and without justification, induced the Company and its affiliates to breach their contractual agreements with Plaintiff, cease doing all business with Plaintiff, and wrongfully taking Plaintiff's equity securities, by misrepresentation and/or persuasion, in a deliberate effort to harm Plaintiff in violation of Tenn. Code. Ann. § 47-50-109.

148.    Had it not been for Defendant SE's interference, Plaintiff would have continuing employment, equity, and business relationships with the Company and its affiliates.

149.    As a direct and proximate result of Defendant SE's wrongful actions Plaintiff suffered and continues to suffer significant damages.

28

150.    Accordingly, Plaintiff demands judgment against Defendant SE for common law and statutory tortious interference in an amount to be determined at trial with treble damages together with all interest, costs, and expenses allowed by law and incurred by Plaintiff, including without limitation, attorney fees.

## COUNT II
## VIOLATION OF TENN. CODE ANN. § 39-13-601, et seq.
### (Defendant SE)

151.    Plaintiff incorporates and restates each of the above paragraphs as if fully stated herein.

152.    The Tennessee Wiretapping and Electronic Surveillance Act, codified in Tennessee Code Annotated § 39-13-601, *et seq*. Section 39-13-601(a)(l)(A) provides *inter alia*: "it is unlawful to intercept oral or electronic communications." Tennessee Code Annotated § 39-13-603 provides a civil remedy to an aggrieved person whose wire, oral, or electronic communications are intentionally intercepted:

> (a) ...[A]ny aggrieved person whose wire, oral or electronic communication is intentionally intercepted, disclosed, or used in violation of § 39-13-601 or title 40, chapter 6, part 3 may in a civil action recover from the person or entity which engaged in that violation the following relief:
>
>> (1) The greater of:
>>
>> (A) The sum of the actual damages, including any damage to personal or, business reputation, relationships, suffered by the plaintiff and any profits made by the violator as a result of the violation; or
>>
>> (B) Statutory damages of one hundred dollars ($100) a day for each day of violation or ten thousand dollars ($10,000), whichever is greater; and
>>
>> (2) Punitive damages; and
>>
>> (3)  A reasonable attorney's fee and other litigation costs reasonably incurred.

Tennessee Code Annotated § 39-13-603.

29

153. Defendant SE intentionally intercepted and/or endeavored to intercept Plaintiff's electronic communications in the form of his emails and social media communications (e.g. Gmail, Twitter, Facebook, AT&T, eBay and Parler).

154. Upon information and belief, because of and as a direct and proximate result of Defendant SE's allegations contained in her communications, the Company and its affiliates, intentionally intercepted and/or endeavored to intercept Plaintiff's private Twitter direct messages, in concert with Defendant SE.

155. Upon information and belief, Defendant SE also used and disclosed Plaintiff's illegally obtained electronic communications and personal information to third parties to commit the tortious acts complained of herein in concert with the Company and its affiliates.

156. As a direct and proximate result of Defendant SE's tortious conduct complained of herein, Plaintiff has sustained damages including, but not limited to money damages in the form of substantial lost compensation due to Plaintiff from the Company and its affiliates, loss of future earning potential, invasion of privacy, and severe emotional distress.

157. In the alternative, Defendant SE is liable for statutory damages.

158. Defendant SE's conduct was intentional and willful, and accordingly she is also liable for punitive damages.

159. Defendant SE's conduct further entitles Plaintiff to a recovery of reasonable attorney's fees and other litigation costs reasonably incurred.

160. Accordingly, Plaintiff demands judgment against Defendant SE for violation of the Tennessee Wiretapping and Electronic Surveillance Act, as codified in Tennessee Code Annotated § 39-13-601, *et seq.* in an amount to be determined at trial together with all interest, costs, and expenses

30

allowed by law and incurred by Plaintiff, including without limitation, reasonable attorney fees and other litigation costs reasonably incurred and punitive damages.

## COUNT III
## VIOLATION OF TENNESSEE PERSONAL AND COMMERCIAL COMPUTER ACT OF 2003
## Tenn. Code Ann. § 39-14-601, *et seq.*
### (Defendant SE)

161.    Plaintiff incorporates and restates each of the above paragraphs as if fully stated herein.

162.    The Tennessee Personal and Commercial Computer Act, is codified in Tennessee Code Annotated § 39-14-601, *et seq.* Section 39-14-602 provides *inter alia*, that whoever:

> "[a]ccesses, causes to be accessed, or attempts to access any computer software, computer network, or any part thereof, for the purpose of maliciously gaining access to computer material or to tamper maliciously with computer security devices including, but not limited to, system hackers, commits a Class A misdemeanor;
>
> *******
>
> [m]akes or causes to be made an unauthorized copy, in any form, including, but not limited to, any printed or electronic form of computer data, computer programs, or computer software residing in, communicated by, or produced by a computer or computer network commits an offense punishable as provided in § 39-14-105.

Tenn. Code. Ann. § 39-14-602(b)(4-5).

163.    Tenn. Code. Ann. § 39-14-604(a) provides:

> Any person whose property or person is injured by reason of a violation of any provision of this part may file a civil action and recover for any damages sustained and the costs of the civil action. Without limiting the generality of the term, damages shall include loss of profits.

164.    Upon information and belief, Defendant SE intentionally and without authorization accessed, caused to be accessed, and/or attempted to access multiple computer networks by hacking Plaintiff's email and social media accounts, without Plaintiff's knowledge or consent in violation of Tenn. Code. Ann. § 39-14-602(b)(4).

31

165.    Upon information and belief, in coordination with and as a proximate result of Defendant SE's accusations, the Company and its affiliates intentionally and without authorization accessed, caused to be accessed, and/or attempted to access the Twitter network by use of a third-party contractor to obtain Plaintiff's private Twitter communications without Plaintiff's knowledge or consent in violation of Tenn. Code. Ann. § 39-14-602(b)(4).

166.    Upon information and belief, Defendant SE made unauthorized copies of computer data in violation of Tenn. Code. Ann. § 39-14-602(b)(5).

167.    Upon information and belief, Defendant SE intentionally transmitted and/or attempted to transmit Plaintiff's illegally obtained confidential personal information to third parties in an effort to harm him.

168.    Plaintiff has sustained damages including, but not limited to money damages in the form of substantial lost compensation due to Plaintiff from the Company and its affiliates, lost profits, loss of future earning potential, invasion of privacy, and severe emotional distress.

169.    The actions of Defendant SE were wanton, reckless, willful, and outrageous.

170.    Plaintiff is also entitled to recover the costs of this civil action pursuant to Tenn. Code. Ann. § 39-14-604(a).

171.    Accordingly, Plaintiff demands judgment against Defendant SE for violation of the Tennessee Personal and Commercial Computer Act, as codified in Tennessee Code Annotated § 39-14-601, *et seq.* in an amount to be determined at trial together with all interest, costs, lost profits, and expenses allowed by law and incurred by Plaintiff, including without limitation, reasonable attorney fees and other litigation costs reasonably incurred and punitive damages.

## COUNT IV
## <u>VIOLATION OF THE STORED COMMUNICATIONS ACT- 18 U.S.C. § 2701</u>
### (Defendant SE)

172.    Plaintiff incorporates and restates each of the above paragraphs as if fully stated herein.

173.    "Whoever intentionally accesses without authorization a facility through which an electronic communication service is provided" violates the Stored Communications Act as codified in 18 U.S.C. § 2701(a).

174.    The Act also provides that any "person aggrieved by any violation of this chapter in which the conduct constituting the violation is engaged in with a knowing or intentional state of mind may, in a civil action, recover from the person or entity which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2701(a).

175.    Under the Act, appropriate relief includes preliminary and other equitable relief, damages, and reasonable attorney fees and other litigation costs. 18 U.S.C. Sec. 2707(a). The Act further provides that damages include actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation and that in no case shall a person entitled to recover receive less than the sum of $1,000. 18 U.S.C. Sec. 2707(c).

176.    Defendant SE intentionally accessed without authorization a facility through which an electronic communication service is provided and thereby obtained, altered, or prevented authorized access to a wire or electronic communication while it was in electronic storage in such system by intentionally hacking or attempting to hack into Plaintiff's email account, Plaintiff's Twitter account, Plaintiff's Parler account, Plaintiff's wife's Twitter, Facebook, and eBay accounts, Plaintiff's AT&T account, and Plaintiff's wife's AT&T account, in violation of 18 U.S.C. § 2701(a).

177.    Plaintiff has suffered damages as a direct and proximate result of the same.

178.	Accordingly, Plaintiff demands judgment against Defendant SE for violation of the Federal Stored Communications Act in an amount to be determined at trial, together with all accruing interest and costs, including without limitation, attorneys' fees and all expenses incurred by Plaintiff.

## COUNT V
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Defendant SE)

179.	Plaintiff incorporates and restates each of the above paragraphs as if fully stated herein.

180.	The conduct of Defendant SE as described above resulted in the intentional infliction of severe emotional distress upon Plaintiff.

181.	Defendant SE's intentional conduct was so outrageous so as not to be tolerated in a civilized society.

182.	As a direct and proximate result of Defendant SE's conduct, Plaintiff has suffered damages, including without limitation, severe emotional distress.

183.	The actions of Defendant SE were wanton, reckless, willful, and outrageous.

184.	Accordingly, Plaintiff demands judgment against Defendant SE for Intentional Infliction of Emotional Distress in an amount to be determined at trial, together with all accruing interest and costs, including without limitation, attorneys' fees and all expenses incurred by Plaintiff, and punitive damages.

## COUNT VI
## VIOLATION OF THE FEDERAL WIRETAP ACT, 18 U.S.C. § 2511, *ET. SEQ.*
### (Defendant SE)

185.	Plaintiff incorporates and restates each of the above paragraphs as if fully stated herein.

186.	Defendants intentionally intercepted and/or endeavored to intercept the contents of Plaintiff's electronic communications including but not limited to his email and social media accounts by use of an electronic device such as a personal computer or smart phone in violation of 18 U.S.C. § 2511 (1)(a).

34

187.    Defendant SE knowingly used Plaintiffs illegally intercepted communications to harm

Plaintiff by, without limitation, discovering the identity of the Company and its affiliates and

inducing them to breach their contractual obligations to Plaintiff in violation of 18 U.S.C. § 2511

(1)(d).

188.    As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess

statutory damages to Plaintiff; injunctive and declaratory relief; punitive damages in an amount to be

determined by a jury, but sufficient to prevent the same or similar conduct by Defendant SE in the

future, and a reasonable attorney's fee and other litigation costs reasonably incurred.

189.    Accordingly, Plaintiff demands judgment against Defendant SE for violation of the Federal

Wire Tap Act in an amount to be determined at trial, together with all accruing interest and costs,

including without limitation, attorneys' fees and all expenses incurred by Plaintiff, and punitive

damages.

## COUNT VII
## DEFAMATION: LIBEL
### (Defendant SE)

190.    Plaintiff incorporates and restates each of the above paragraphs as if fully stated herein.

191.    From December 11, 2019, to June 11, 2020, Defendant SE sent at least 14 emails to the

Company and its affiliates regarding Plaintiff. Contained in the emails are at least 30 separate

published statements that Defendant SE made with knowledge that the statement was false or injuring

to Plaintiff as enumerated in Collective Exhibit 10, attached hereto.

192.    Defendant SE published on her Personal Twitter Account additional false and defamatory

statements regarding Plaintiff as enumerated in Collective Exhibit 10, attached hereto.

193.    Defendant SE also published to Plaintiff's stepson's Instagram account further false and

defamatory statements regarding Plaintiff as enumerated in Collective Exhibit 10 attached hereto.

194. Additionally, as discussed above, Defendant SE published further false and defamatory statements to her @SarahElizab370 and @LifeofSarah370 Twitter accounts as enumerated in Collective Exhibit 11.

195. The defamatory statements were false, substantially untrue, and materially false. *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999). Defendant SE acted with malice.

196. When Defendant SE made the defamatory statements, she knew that they were false or acted with willful and intentional disregard of the truth or falsity of the statements. *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 647 (Tenn. 2001).

197. Defendant SE had no applicable privilege or legal authorization to publish the defamatory statements. The defamatory statements were a substantial factor in causing Plaintiff to suffer economic and non-economic loss, in an amount to be proven at trial. *Revis v. McClean*, 31 S.W.3d 250, 252-53 (Tenn. Ct. App. 2000); *McGuffey v. Belmont Weekday Sch.*, No. M2019- 01413-COA-R3-CV, 2020 Tenn. App. LEXIS 242, at *48 (Tenn. Ct. App. May 27, 2020).

198. Accordingly, Plaintiff demands judgment against Defendant SE for libel in an amount to be determined at trial, together with all accruing interest and costs, including without limitation, attorneys' fees and all expenses incurred by Plaintiff, and punitive damages.

### COUNT VIII
### CIVIL CONSPIRACY
### (All Defendants)

199. Plaintiff incorporates and restates each of the above paragraphs as if fully stated herein.

200. At all times relevant to this matter there existed a combination of two or more persons, such combination comprising Defendant SE and Does 1-3, who are certain individuals, agents, and other persons acting on behalf of or in concert with Defendant SE.

201. The persons party to this combination, and each of them, sought to injure Plaintiff and Plaintiff's reputation, existing business relationships with the Company and its affiliates, prospective

36

business relationships, ability to earn an income, the ability to engage in his current and future lines of business, and Plaintiff's relationships with his wife and stepson. Such persons also sought to publish false and defamatory statements about Plaintiff, place Plaintiff in a false light before the public, his family, and the Company and its affiliates, intentionally inflict emotional distress upon Plaintiff, illegally access or attempt to access Plaintiff's internet network accounts and accounts with electronic communication services in violation of Tennessee Code Annotated § 39-14-601, *et seq.*, 18 U.S.C. § 2511. et seq, 18 U.S.C. § 2701 et seq., and Tennessee Code Annotated § 39-13-601, *et seq*. Further, such persons sought to tortiously interfere with Plaintiff's business and contractual relationships with the Company and its affiliates and Plaintiff's prospective business relationships with the Company and its affiliates and to destroy evidence related to the same.

202.    The parties to the conspiracy, and each of them, reached a meeting of the minds on the object of the conspiracy.

203.    In pursuance of the objects of the conspiracy, Defendant SE tortiously interfered with Plaintiff's business and contractual relationships with the Company and its affiliates and Plaintiff's prospective business relationships with the Company and its affiliates, published false and defamatory statements about Plaintiff to the Company and its affiliates, and tortuously interfered with Plaintiff's existing and prospective business relationships with the Company and its affiliates. Further, in pursuance of the objects of the conspiracy, Defendant SE placed Plaintiff in a false light before the public, his family, and the Company and its affiliates, intentionally inflicted emotional distress upon Plaintiff, illegally accessed or attempted to access Plaintiff's internet network accounts and accounts with electronic communication services in violation of Tennessee Code Annotated § 39-14-601, *et seq.*, 18 U.S.C. § 2511 *et seq.*, 18 U.S.C. § 2701 *et seq.*, and Tennessee Code Annotated § 39-13-601, *et seq*.

204. Defendant SE as well as Does 1-3 defrauded Plaintiff by catfishing him with multiple Bot and Sock-Puppet Twitter account in furtherance of the instant conspiracy.

205. Upon information and belief, since being served with process in this original action on November 19, 2020, Defendant SE has been steadily and illegally deleting, hiding, and/or secreting electronic evidence relevant to this case to conceal her own tortious conduct, to protect Does 1-3 whose tortious conduct toward Plaintiff is bootstrapped to the same, and to hinder Plaintiff from defending himself from Defendant SE's tortious conduct. This includes but is not limited to Defendant SE's deletion of the @Miralaguna8 Twitter account on or about November 19, 2020, @SarahExtra3770 Twitter account on or about December 1, 2020, and dozens if not hundreds of additional Twitter communications in the spring and summer of 2021 and through the present day.

206. As a direct and proximate result of the conspiracy, Plaintiff has suffered damages in an amount to be proven at trial.

207. Does 1-3 and Defendant SE acted intentionally, willfully, or with malice in conspiring to and conducting the tortious acts described above. *West v. Media Gen. Convergence, Inc*., 53 S.W.3d 640, 647 (Tenn. 2001).

208. Accordingly, Plaintiff demands judgment against Defendant SE and Does 1-3 for civil conspiracy in an amount to be determined at trial, together with all accruing interest and costs, including without limitation, attorneys' fees and all expenses incurred by Plaintiff, and punitive damages.

## COUNT IX
## PUNITIVE DAMAGES
### (Defendant SE)

209. Plaintiff incorporates and restates each of the above paragraphs as if fully stated herein.

210. The actions of the Defendant SE were wanton, reckless, willful, and outrageous.

38

211.    As described herein, Defendant SE intentionally made false and/or misleading statements concerning Plaintiff and illegally obtained Plaintiff's private information and then used it in such a way to induce the Company and its affiliates to breach their contracts with him, immediately cease doing all business with Plaintiff, and wrongfully seize Plaintiff's equity securities, to cause Plaintiff monetary and/or reputational harm and/or to enrich herself.

212.    As described above, Defendant SE's actions have caused injury to Plaintiff.

## PRAYER FOR RELIEF

**WHEREFORE, PRIMESES CONSIDERED**, Plaintiff respectfully prays that this Honorable Court grant him relief as follows:

i.    Judgment for compensatory, special, punitive, and/or treble damages in appropriate amounts to be established at trial;

ii.    Injunctive relief prohibiting the publication or republication of the defamatory statements;

iii.    An award of costs associated with this action, including pre- and post-judgment interest and reasonable attorneys' fees;

iv.    And such other and further relief to which Plaintiff may be entitled, in law and equity and which are just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.


This 7th day of June 2022.

Respectfully submitted,

39

/s/Jonathan M. Wolf

Bruce S. Kramer (#7472)
6000 Poplar Ave, Suite 150
Memphis, TN 38119
bkramer@appersoncrump.com
901-271-2710

Jonathan M. Wolf (#35445)
JONATHAN M. WOLF, PLLC
1515 Demonbreun St. Suite 1408
Nashville, TN 37203
Jonathan@wolf.lawyer
615-422-5545

*Counsel for Plaintiff Thomas E. Santoni*

## **VERIFICATION**

I, THOMAS E. SANTONI, am the Plaintiff in the action herein and do hereby swear under penalty of perjury that the foregoing Amended Verified Complaint, and the facts contained herein, are true and correct to the best of my knowledge and belief.

_____

THOMAS E. SANTONI

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing has been

forwarded via the District Court E-File system, to the following on June 7, 2022.

Mark T. Freeman,
2126 21st Avenue South
Nashville, Tennessee 37212
Mark@Freemanfuson.com
Phone: 615-298-7272
Fax: 615-298-727

**/s/ Jonathan M. Wolf**
Jonathan M. Wolf, Esq.